**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DIETRICH & ASSOCIATES, INC., *Plaintiff,*  v.  OCTOBER THREE LLC, et al., *Defendants.* | CIVIL ACTION  NO. 20-5002 |

**PAPPERT, J.**                                                                                      **April 26, 2021**

**<u>MEMORANDUM</u>**

Dietrich & Associates, Inc. claims October Three LLC, October Three Consulting LLC and O3 Annuity Services LLC tortiously interfered with its business relationships and its employment agreements with non-parties John Neison, Jill Neison and Mark Unhoch. D&A's suit is related to and arises out of the same facts as *Dietrich & Associates, Inc. v. John Neison, et al.,* Civ. A. No. 18-5034 (E.D. Pa.) (the Related Action), pending before the Court. Defendants move to dismiss D&A's claims as barred by the statute of limitations. The Court denies their motion.

I

D&A assists "pension plan fiduciaries with insuring retirement benefits." (Compl., ECF 1, ¶ 1.) October Three "provides actuarial consulting and administrative services to retirement plan sponsors" and used D&A's "specialized annuity placement services" for its existing clients' needs and to gain new clients. (*Id.* ¶¶ 29, 31.) John and Jill Neison and Unhoch worked for D&A until December 2017 or January 2018, when they went to work for O3 Annuity, a new division of October Three. (*Id.* ¶¶ 3, 33.) They had developed a business relationship with October Three while working for D&A.

D&A alleges it "learned that John Neison had solicited one or more of [its] clients

to perform work on" October Three's behalf in February 2018. (*Id.* ¶ 34.) In a February 13, 2018 cease and desist letter copied to October Three's CEO, D&A's counsel accused John of violating his D&A employment agreement's non-solicitation clause. (*Id.* ¶ 35.) Ten days later, October Three's counsel responded that October Three had not asked Mr. Neison to violate his employment agreement with D&A and it was not "aware of any such activity." (*Id.* ¶ 36.) On February 27, 2018, D&A's counsel wrote that D&A did not contend "October Three ha[d] requested Mr. Neison to violate his obligations of non-disclosure and/or non-solicitation," or that D&A was "specifically aware of any such conduct," but it had "reason to believe" John Neison had done so and asked for October Three's help with obtaining John Neison's compliance with his employment agreement's requirements. (*Id.* ¶ 37.) October Three did not respond. (*Id.* ¶ 38.)

On March 12, 2018, D&A's counsel wrote to October Three claiming Jill Neison had solicited a D&A customer that John Neison and Unhoch had engaged with while at D&A, an engagement "of which she was obviously aware." (*Id.* ¶ 39.) D&A asked October Three to help ensure its former employees' compliance with their restrictive covenants. (*Id.* ¶ 39.) Again, October Three did not respond. (*Id.* ¶ 40.)

At his June 5, 2019 deposition in the Related Action, October Three's President and CEO Jeff Stevenson "testified that he formed O3 Annuity specifically for [John and Jill Neison and Unhoch] to compete with" D&A. (*Id.* ¶¶ 42, 45.) He said that "in or around August 2017" he told his partner Ray Aguilera "to pursue hiring Mark Unhoch" and "that he, Aguilera, and others at October Three met and spoke with Mark Unhoch, Jill Neison, and John Neison multiple times between August 2017 and January 2018 as part of the hiring process." (*Id.* ¶ 48.) October Three and Stevenson were aware of the

2

Neisons' and Unhoch's restrictive covenants before October Three offered to hire them. (*Id.* ¶ 50.) Nevertheless, October Three and Stevenson instructed them "to direct their sales and marketing efforts toward [D&A's] clients and referral clients" on "multiple occasions." (*Id.* ¶ 54.) Stevenson approved O3 Annuity's work for D&A's "clients, including on placements [John and Jill Neison and Unhoch] had been actively working on" when they left D&A. (*Id.* ¶ 53.) At least once, Unhoch asked Stevenson if he should pursue a bid for a plan sponsor that was D&A's client and was told to "put our bid in" and "run with it." (*Id.* ¶ 55.) D&A alleges it "did not know, and had no way to know, these facts prior to" Stevenson's deposition. (*Id.* ¶¶ 44, 58.)

D&A claims October Three and Stevenson's instructions resulted in the diversion of annuity placements to October Three, including eight placements D&A was working on when Jill and John Neison and Unhoch left it, and at least twenty-two placements from October Three's solicitation of D&A's established referral clients. (*Id.* ¶¶ 63.) It maintains October Three had "the purpose or intent to divert business (and the revenue associated therewith) away from [D&A] to October Three" and the "interference was intentional, willful and outrageous" and "undertaken with reckless indifference to [D&A's] rights." (*Id.* ¶¶ 66-67.) D&A asserts "October Three's conduct was neither justified nor privileged" and it "caused substantial harm to" D&A. (*Id.* ¶¶ 68-69.)

D&A also claims October Three instructed, induced, assisted and/or encouraged the Neisons and Unhoch to breach their restrictive covenants. (*Id.* ¶ 74.) It contends October Three, without privilege or justification, "intentionally and improperly instructed [them] to perform work for [D&A's] clients and referral clients during the

3

restrictive covenant periods." (*Id.* ¶¶ 74, 77.) D&A maintains they followed October Three's instructions, resulting in the diversion of annuity placements from D&A to October Three, causing D&A substantial and irreparable harm. (*Id.* ¶ 75-76, 78.)

II

To satisfy Federal Rule of Civil Procedure 12(b)(6), D&A's Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When the Complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).  However, this "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Connelly*, 809 F.3d at 786–87).

To decide a motion to dismiss without converting it into a summary judgment

4

motion, courts consider only the Complaint's allegations, matters of public record and, where appropriate and necessary, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A plaintiff's claims are based on a document if it is "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*,114 F.3d 1410, 1426 (3d Cir.1997) (emphases omitted). Lack of notice, "the primary problem raised by looking to documents outside the complaint," is absent when the plaintiff has actual notice of the documents and its pleading relies on them. *Id*.

"Technically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in the answer, not in a motion to dismiss." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citation omitted); s*ee also* Fed. R. Civ. P. 8(c)(1); *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017) ("The running of the statute of limitations is an affirmative defense."). However, where the time bar is "apparent on the face of the complaint" Rule 12(b)(6) dismissal is allowed in this Circuit. *Fried v. JP Morgan Chase & Co.*, 850 F.3d 590, 604 (3d Cir. 2017) (citation omitted). If "the pleading does not reveal when the limitations period began to run," then "the statute of limitations cannot justify Rule 12 dismissal." *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011).

### III

### A

Defendants argue D&A's tortious interference claims are time-barred. It is their burden to establish untimeliness. *See Richard B. Roush Profit Sharing Plan v. New*

*England Mut. Life Ins.*, 311 F.3d 581, 585 (3d Cir. 2002). In Pennsylvania, tortious interference claims must be brought within two years of when they accrued. *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004) (citing 42 Pa. Cons. Stat. § 5524). "[A] statute of limitations begins to run only once a plaintiff can assert and maintain an action." *Id.*; *see also Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005) (holding a cause of action accrues when the plaintiff could have "first maintained the action to a successful conclusion"). Each of D&A's claims accrued at "'the occurrence of the final significant event necessary to make the claim suable.'" *CGB Occupational Therapy, Inc.*, 357 F.3d at 383 (quoting *Barnes v. American Tobacco Co.*, 161 F.3d 127, 136 (3d Cir. 1998)).

To state a tortious interference claim, D&A must show: (1) an existing contractual or prospective contractual relation between it and a third party; (2) Defendants' purposeful action, specifically intended to harm the contractual relationship; (3) the absence of privilege or justification; and (4) damages resulting from Defendants' conduct. *See Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009). For tortious interference with a prospective contract, D&A must also show "a reasonable likelihood that the relationship would have occurred but for [Defendants'] interference." *Id.*

B

D&A filed its Complaint on October 9, 2020 (ECF 1), so its claims are barred if it is apparent on the face of the Complaint that they accrued before October 9, 2018. It is not; the Complaint does not reveal when the limitations period began to run. Defendants contend the Court can find that D&A's claims accrued by "no later than

mid-May 2018" (Defs.' Br., ECF 4-6, at 17) by considering the Complaint and other documents incorporated into it, including the Related Action's complaint, the cease and desist correspondence between the parties and a string of emails between Kurt Dietrich, D&A's President and CEO, and Geoffrey Dietrich, its Executive Vice President.  (*Id.* at 10-22.)  They argue the Neisons' and Unhoch's solicitations for October Three caused D&A "actual legal harm" (Defs.' Reply Br., ECF 11 at 5) and D&A knew or should have known after receiving October Three's May 11, 2018 letter that October Three intended to "continue to solicit entities [it] considered to be its customers."  (ECF 4-6, at 19-20 (arguing the "letter dots the 'I's' and crosses the 'T's' as to when Plaintiff knew it had suffered a legal injury")).

D&A knew the Neisons and Unhoch were going to work for October Three by December 2017 or January 2018 and Defendants contend it believed John Neison was engaging in tortious conduct by January 2018.  (*Id.* at 17 citing Compl. ¶¶ 33, 133, 136.)  In Defendants' view, D&A's cease and desist letters "directly evidence [its] knowledge of injury."[1]  (*Id.* at 18.)  Further, they maintain a May 1, 2018 email exchange between Kurt and Geoffrey Dietrich discussing Jill Neison's alleged targeting of a D&A relationship supports the conclusion that D&A's knew by then that the Neisons and Unhoch had diverted at least one of its customers.  (*Id.* at 20.)  They contend "simple application of respondeat superior principles" means there was "*potentially* . . . a legal injury to [D&A] once D&A became aware of" the Neison's and Unhoch's activities.  (*Id.* at 23-24 (emphasis added).)

---

[1]     At the same time, Defendants argue the letters indicate D&A's belief "that October Three was *possibly* engaged in improper conduct," not that, in fact, it was doing anything improper.  (ECF 4-6 at 18 (emphasis added).)

D&A counters that it would be premature to determine the applicability of Defendants' limitations defense on a motion to dismiss. It contends the Court should not base its decision on a "handful" of "cherry-picked" documents from the "voluminous record" in the Related Action that were "not attached to or referenced in the instant Complaint." (Pl's. Opp'n Mem., ECF 8, at 1.) It argues it "sustained harm at the earliest when October Three closed annuity transactions for D&A clients and commissions that rightfully should have been paid to D&A were instead paid to October Three." (*Id.* at 21.) It maintains October Three's stated "intent to commit a future wrong" in the May 11, 2018 letter is not enough to bar their claims. (*Id.*) Instead, it only knew of threatened future harm, and did not have an "actionable injury that triggered the limitations period to run" until October Three consummated annuity placements with its clients or prospective clients "and received commissions at closing for doing so." (*Id.*)

In the context of its claim for tortious interference with its business relationships, D&A also argues "each diverted annuity placement was a separate, stand-alone transaction" and it sustained a distinct injury "each and every time that October Three brokered and closed a placement for a D&A client or referral client and received a commission at closing that rightfully should have been paid to D&A . . . ."[2]

---

[2] Through this allegation, D&A appears to contend the continuing tort or continuing violation doctrine applies to its interference claims, another exception to the rule that "under normal circumstances, the statute of limitations begins to run as soon as the right to institute and maintain a suit arises." *Fine*, 870 A.2d at 857. The continuing tort doctrine applies "when a plaintiff alleges a continuing pattern of misconduct," making an action "timely so long as the last act evidencing the continuing practice falls within the limitations period" and allows a court "to grant relief for . . . earlier related acts that would otherwise be time barred." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001). At this point all the Court need decide is whether or not the time bar is apparent on the face of D&A's Complaint. It is thus premature to determine the possible applicability of any continuing violation theory.

(*Id.* at 16.) D&A contends the Complaint does not identify the specific dates of any alleged injury because October Three has yet to provide it with the closing dates for each placement. (*Id.* at 16.) It argues "many if not all of the diverted placements closed within two years of the Complaint being filed, and thus accrued within the limitations period." (*Id.* at 17.)

D&A also argues the limitations period for its claim for tortious interference with its employment agreements did not begin when the Neisons and Unhoch joined October Three. (*Id.* at 18-19.) D&A asserts that what matters is when the Neisons' and Unhoch's solicitations resulted in diverted annuity placements, dates which are not clear from the Complaint. (*Id.* at 18-20.) In D&A's view, Stevenson's instructions to "disregard the[ir] restrictive covenants and close placements for D&A clients" triggered its claim, and it did not learn of those until Stevenson's 2019 deposition. (*Id.* at 19.)

C

There is no question John and Jill Neison and Unhoch had left D&A for October Three before October 2018. On D&A's own allegations, it had some awareness by then that Defendants sought to use the Neisons' and Unhoch's relationships with D&A clients or prospective clients for their benefit. However, this is not enough to make it clear from the face of the Complaint – or from any external documents that are integral to it – whether the final significant event necessary to make D&A's tortious interference claims suable had occurred before then. *See CGB Occupational Therapy*, 357 F.3d at 384 ("[A] tortious interference claim does not accrue until, at least, the plaintiff suffers injury (i.e., 'actual legal damage') as a result of the defendant's conduct."). The parties' conflicting arguments raise fact questions that are not

appropriate for resolution on a motion to dismiss. *Cf. Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, No. 13-03101, 2015 WL 1954287, at *15 (E.D. Pa. Apr. 30, 2015) (denying motion to dismiss Huntington Valley's tortious interference claim as time-barred where Aetna argued the claims accrued when it sent allegedly interfering letters and Huntington Valley argued they accrued not when the letters were sent, but when it was injured from them). Further, even if D&A must invoke the discovery rule to bring some or all its claims within the limitations period, it has set forth enough facts to show the rule may apply to its claims.[3] D&A has plausibly alleged reasonable minds could differ as to whether it knew or should have known it had suffered the "actual legal harm" required to trigger the statute of limitations for its tortious interference claims by October 2018.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[3] "[T]he discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." *Fine*, 870 A.2d at 859. Whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause involves a factual determination that is ordinarily for a jury to decide unless "reasonable minds would not differ" as to the outcome. *Id.* at 858. The Court "'may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense.'" *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015) (quoting *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014)); *see also Fine*, 870 8.2d at 858 ("The application of the discovery rule is a factual issue that cannot be resolved at the Preliminary Objection stage."). "Because a potential plaintiff cannot discover his injury before it has occurred, the discovery rule only postpones the accrual date of a claim 'where the [plaintiff] is unaware of the injury.'" *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 214 (3d Cir. 2008) (*quoting CGB Occupational Therapy*, 357 F.3d at 384. "It does not accelerate the accrual date 'when the [plaintiff] becomes aware that he will suffer injury in the future.'" *Id.* (quoting *CGB Occupational Therapy*, 357 F.3d at 384.)